IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TELEBRANDS CORP., <br><br> Plaintiff, <br><br> v. <br><br> MY PILLOW, INC., <br><br> Defendant. | Case No. 1:18-cv-6318 |

## SECOND AMENDED COMPLAINT

Plaintiff Telebrands Corp. ("Telebrands"), by its undersigned attorneys, for its complaint against My Pillow, Inc. ("MP" or "Defendant"), alleges as follows:

## THE PARTIES

1. Telebrands Corp. is a corporation organized and existing under the laws of the State of New Jersey, having a place of business at 79 Two Bridges Road, Fairfield, New Jersey 07004.

2. Telebrands is a consumer products marketing company and, since 1983, has been engaged in the business of marketing and selling a wide variety of consumer products in this Judicial District and elsewhere, through direct response advertising and through national retail stores. Telebrands is one of the recognized leaders in the direct response television marketing industry, selling well known products such as Peg Egg, Star Shower, Pocket Hose, Atomic Beam Flashlight, Red Copper Cookware, Sticky Buddy, the Olde Brooklyn Lantern, and Who Knew Books.

3. For over 35 years, Telebrands has been a leading developer and marketer of consumer products. Telebrands is widely known through the retail industry for the manner in which it effectively drives retail sales through its nationwide advertising programs. For many

years, Telebrands has cultivated relationships with a wide variety of wholesalers, marketers, distributors, sellers, and retailers including, for example, large retail chain stores, catalogues, and Internet sales websites.

4. Defendant MP is a Minnesota corporation having a principal place of business at 343 East 82nd Street, Suite 100, Chaska, Minnesota 55318.

## NATURE OF THE ACTION

5. Telebrands brings this lawsuit against MP for breach of contract and in the alternative, equitable estoppel, and for conversion. In May 2012, Telebrands and MP entered into an agreement in which Telebrands was given the exclusive right to market and distribute MP's "My Pillow" product in North American "brick and mortar retail stores and their associated online outlets." Pursuant to the agreement, MP is the exclusive supplier of the My Pillow product to Telebrands. In addition, MP may market My Pillow directly to consumers on television but may not compete directly with Telebrands for retail sales to Telebrands' customers.

6. The My Pillow product was not an immediate success. However, over the last six years, Telebrands has expended substantial efforts and resources to market My Pillow, including by leveraging its valuable retail relationships to get My Pillow into some of the most coveted shelf space in North America. Indeed, in March of 2018, Telebrands was successful in getting the My Pillow product into the main bedding department of Walmart—attaining the proverbial "brass ring" for this type of product. Telebrands has had similar success in selling the My Pillow product to a number of other major retailers in the U.S., including Kohl's, Bed Bath & Beyond, and JC Penny. As a direct result of Telebrands' relationships and efforts over the last six years, Telebrands anticipated selling approximately 3 million units in calendar year 2018.

7.   However, on August 21, 2018, MP abruptly and wrongfully purported to terminate its relationship with Telebrands, refused to ship Telebrands further product, and began contacting Telebrands retail customers in an effort to do an end run around Telebrands and sell to those customers directly.  In short, Telebrands delivered retail success and MP is now attempting to cut Telebrands out of the supply chain to unjustly retain all retail profits for itself.

8.   As a result of My Pillow's wrongful actions, Telebrands has suffered—and continues to suffer—substantial lost sales and damage to its reputation and standing with retailers. Telebrands has expended considerable resources to fulfil its obligations to promote and market the My Pillow product—efforts that have inured to the benefit of My Pillow.  Telebrands did so in reliance on My Pillow's promise to refrain from selling directly to retailers.  My Pillow now seeks the benefit of Telebrands' substantial efforts without honoring its own commitments to Telebrands.

## JURISDICTION AND VENUE

9.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

10.   With respect to diversity, the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.   The May 30, 2012 License Agreement (the "License Agreement") between the Parties provides for venue and personal jurisdiction in this District.  Specifically, Section 15 of the License Agreement states: "The parties agree that the state or federal courts located in Chicago, Illinois shall have exclusive jurisdiction regarding any dispute arising out of the subject matter of this Agreement, and consent to personal jurisdiction and venue in such courts."  Ex. 1.

12.   Personal jurisdiction over MP also exists because MP is conducting business on a systematic and continuous basis within the United States, including this State and District.  MP,

directly or through affiliates, subsidiaries or intermediaries, transacts business in this State and District, including offering to sell and/or selling its My Pillow product within this State and District directly or through intermediaries via established distribution channels.

## COUNT I
## BREACH OF CONTRACT

13. In May 2012, Telebrands and MP entered into the License Agreement under which Telebrands received an exclusive license under MP's patent, copyrights, and trademarks in order to exclusively "advertise, promote, market, distribute, and sell" the My Pillow product in the "Territory." Ex. 1, Recitals and Section 1. Telebrands' exclusive "Territory" is "worldwide except for Australia and New Zealand; and for all channels of trade except in North America, in which Territory shall solely be distribution and sale to brick and mortar retail stores and their associated online outlets." Ex. 1 at Section 2.

14. At the time of signing the License Agreement, the Parties contemplated signing a "more extensive agreement" but also intended the May 2012 License Agreement to remain in full force and effect if no further agreement was signed. This is reflected in Section 16 of the License Agreement, which states: "The parties intend to enter into a further more extensive agreement embodying the terms herein within sixty days of the Effective Date of this Agreement. Mr. Lindell shall endorse such agreement as to terms applicable to him individually. If the parties do not enter into such further agreement within such period, this Agreement shall remain binding and in full force and effect." Ex. 1 at Section 16.

15. My Pillow was not initially the success the Parties had hoped it would be. In the first year (i.e., from May 2012 to May 2013), approximately 700,000 units were purchased from MP by Telebrands.

4

16. The License Agreement provides that it will automatically renew as long as sales of My Pillow reach 1,000,000 during each year: "The term of the Agreement shall be for a period of one year and shall be automatically renewed for successive one year terms provided unit orders or sales of Current Product shall have reached at least 1,000,000 during the immediate prior year of the term of this Agreement." Ex. 1 at Section 13.

17. Despite sales of less than 1,000,000 through May 2013, MP did not assert that the License Agreement terminated in May 2013. On the contrary, the Parties continued to do business pursuant to the License Agreement.

18. The next year, (i.e., the period ending in May 2014), Telebrands purchased approximately 210,000 My Pillows. Consistent with the Parties' intention to enter into a "more extensive agreement," in May 2014, MP's CEO, Mike Lindell, wrote to Telebrands, stating "I am following up on the agreement." Mr. Lindell noted the potential for termination of the License Agreement based upon less than 1,000,000 units having been sold the previous year and requested a meeting to "put together a new agreement." Ex. 2.

19. Such a meeting never took place and no new agreement was signed. However, as in 2013, the Parties again continued to do business pursuant to the License Agreement.

20. Prior to August 2018, MP never took the position that the License Agreement was terminated in May 2014. In fact, since 2014, Telebrands has continued to act as the exclusive distributor for My Pillow into retail and, through substantial efforts and expenditures, has achieved extraordinary retail success for the product. To date, Telebrands has purchased more than 8 million My Pillow units from MP. Telebrands has leveraged its valuable relationships with retailers to secure placement of My Pillow in high-traffic areas of their stores, including Walmart, Kohl's, and Bed Bath & Beyond. These placements included the retailers' coveted

shelf space, end caps, and pallet features (i.e., pallets of product featured prominently in the middle of an aisle). Telebrands' efforts have yielded impressive results, with Telebrands selling more than 2.7 million units through the period ending in May 2017 and more than 3 million units through the period ending in May 2018.

21. In addition, in March 2018, Telebrands was successful in persuading Walmart to place the My Pillow product in its main bedding department in addition to its "promotional department." For a product of this type, entry into Walmart's main bedding department is a huge success and is almost certain to drive further sales of My Pillow. MP was excited about this development.

22. Despite Telebrands' success, on August 20, 2018—more than six years after MP entered into its successful License Agreement with Telebrands—MP abruptly and unilaterally purported to "discontinue [the] relationship with Telebrands." *See* Ex. 3. MP, for the first time, took the position that the License Agreement "expired according to its terms because Telebrands did not meet the minimum number of units stated in the Agreement." *Id.* MP has since refused to provide Telebrands the product necessary for Telebrands to fulfill its customers' purchase orders.

23. On August 24, 2018, Telebrands responded to MP, pointing out that MP had no legal basis to terminate the Parties' agreement and explaining that Telebrands will suffer serious harm if MP persists in its wrongful conduct. Ex. 4.

24. On August 27, 2018, MP sent another letter to Telebrands, taking the position that the License Agreement expired in May 2014 and since then, because "no new master agreement was ever entered after this date," the Parties' have merely "entered into a series of purchase orders." Ex. 5.

6

25. The License Agreement did not expire in May 2014. Even if MP had the right to take such a position in May 2014, MP failed to enforce such a right and the doctrines of wavier, acquiescence, and/or estoppel now bar MP from claiming that termination or expiration occurred in 2014.

26. To the extent any right arose in 2014 to claim that termination or expiration occurred, MP relinquished that right when it continued—for more than four years—to conduct itself as though the Parties' relationship was governed by the License Agreement. If MP actually believed that no agreement existed between the Parties, it has misled Telebrands to the contrary for years and Telebrands reasonably relied upon MP's conduct to its detriment.

27. Perhaps realizing that its stated basis for termination was unsupportable, MP subsequently raised a host of complaints regarding the advertising practices of third-party retailers and asserting, without support, that these practices are "Telebrands' responsibility." Ex. 6.

28. In the past, MP has raised similar advertising issues with Telebrands and, each time, Telebrands worked with its retail customers to address MP's concerns. In fact, Telebrands has always expressed to MP a willingness to raise such concerns with its retail customers. Given this history, the issues raised in MP's August 28 letter appear to have been pretext to attempt to justify MP's breach of contract and tortious conduct.

29. In fact, the very next day, on August 29, 2018, MP wrote to sales representatives of Walmart in an effort to sell My Pillow product to Walmart directly. Ex. 7. Specifically, an email from MP's Ben Salden stated, among other things:

- "So if we currently are selling into WM stores with a distributor of ours, how would that work if we switch to selling to WM directly? Does it take long to get an 'in-store' agreement?"

- "I just need a time frame to give to our CEO. Lets just say tomorrow our distributor stops selling WM our MyPillow products and we offer them the same products at a cheaper price, how long would that take to get an agreement? And is that something I can just start now or do I have to wait until someone at WM initiates the deal?"

*Id.*

30. On information and belief, MP has engaged in similar efforts to sell product directly to other Telebrands customers, including at least Kohls and Bed Bath & Beyond.

31. The License Agreement is a valid and enforceable contract between Telebrands and MP.

32. At all times relevant to this action, Telebrands has substantially performed all conditions, covenants, and promises required of Telebrands under the License Agreement, except for any terms and conditions the performance of which were excused, prevented, hindered, or frustrated by MP.

33. MP has breached the terms of the License Agreement, including the implied covenant of good faith and fair dealing, by purporting to terminate the License Agreement without justification; refusing to fill purchase orders placed by Telebrands; and attempting to sell directly to Telebrands' customers in the "Territory."

34. As a direct and proximate result of MP's breach of its contractual obligations, Telebrands has been damaged in the form of lost sales and profits, and incurring additional expenses in reliance on the parties' agreement, in an amount to be proven at trial. Telebrands has also suffered damages to its reputation and standing with its customers as a result of MP's wrongful conduct. This harm is irreparable and cannot be compensated by monetary damages.

## COUNT II
## EQUITABLE ESTOPPEL

35. This count is plead in the alternative to breach of express contract.

36. Since May 2014, MP has, through its words and conduct, misrepresented to Telebrands that Telebrands continued to be the exclusive distributor of the My Pillow product into retail and that MP would refrain from seeking to sell product to Telebrands customers. In particular, MP misrepresented and intentionally led Telebrands to believe that MP would refrain from seeking to sell product to Telebrands' customers unless MP gave Telebrands notice that it was ending the arrangement based upon fewer than 1,000,000 units being sold into retail in the year preceding such notice. Furthermore, MP misrepresented and intentionally led Telebrands to believe that if MP chose not to provide such notice in a given year, the arrangement would continue for an additional year on the same terms.

37. Despite leading Telebrands to believe that the parties' relationship was governed by these terms, MP has stated that it believed that no relationship existed beyond the exchange of purchase orders. MP concealed this material fact from Telebrands and misrepresented to Telebrands that the parties' relationship was governed by the terms stated above. MP knew its misrepresentation was false because it believed the parties' relationship to be governed merely by a series of purchase orders.

38. MP's intention was to have no obligation to Telebrands but to convince Telebrands that the relationship was exclusive so that Telebrands would continue to work hard to achieve retail success for the My Pillow product. MP intended or reasonably expected that Telebrands would rely or act upon MP's concealment and misrepresentation.

39. Telebrands reasonably relied in good faith upon MP's misrepresentations by continuing to expend time and resources marketing and selling the My Pillow product in retail. For example, Telebrands' expended considerable resources and effort, and leveraged its valuable retail relationships to secure placement of the My Pillow product in high-traffic areas of retail

9

stores, including Walmart, Kohl's, and Bed Bath & Beyond. These placements included the retailers' coveted shelf space, end caps, and pallet features (i.e., pallets of product featured prominently in the middle of an aisle). Telebrands' efforts yielded impressive results, with more than 2.7 million units sold into retail through the period ending in May 2017 and more than 3 million units through the period ending in May 2018. In addition, in March 2018, Telebrands was successful in persuading Walmart to place the My Pillow product in its main bedding department in addition to its "promotional department." For a product of this type, entry into Walmart's main bedding department is a huge success. MP was excited about this development.

40. Telebrands will be prejudiced if MP is now permitted to deny its representation that the parties' relationship was governed by the terms stated above. Telebrands should be equitably estopped from denying its representations.

41. Throughout the parties' relationship, MP would often order product boxes and labels from third-party manufacturers on Telebrands' behalf so that MP could prepare the My Pillow product in boxes for sale to Telebrands' retail customers.

42. In August 2018, when MP purported to terminate the parties' relationship, 517,170 such product boxes had been ordered by MP and were in MP's possession. Telebrands has paid third-party manufacturer Minnesota Corrugated for these boxes. In addition, MP had ordered an additional 431,447 product boxes and 427,700 product labels from Minnesota Corrugated on Telebrands' behalf.

43. MP, through words and conduct over the course of the parties' relationship, represented that MP would pay for any boxes or product labels that it ordered.

44. Following MP's purported termination of the relationship in August 2018, MP again represented to Telebrands that MP would pay Telebrands for the boxes in its possession and pay Minnesota Corrugated for the additional boxes and labels that MP ordered.

45. MP knew its representations as to payment were false and MP has not paid for the boxes or made arrangement to pay for boxes and labels but has since used at least a portion of them.

46. MP intended or reasonably expected that Telebrands would rely upon its representation of payment in allowing MP to order boxes and labels form Minnesota Corrugated on Telebrands' behalf.

47. Telebrands relied in good faith on MP's representation to its detriment because Telebrands has not been paid for the boxes possessed or used by MP, nor the other materials ordered from Minnesota Corrugated by MP. In addition, MP has caused Telebrands to incur storage fees on certain of the boxes and labels still in the possession of Minnesota Corrugated. Telebrands will be prejudiced if MP is permitted to deny its obligation to pay for the boxes and labels.

48. MP should be equitably estopped from denying its representation that it will pay for the boxes and labels.

## COUNT III
## CONVERSION

49. In August 2018, when MP purported to terminate the parties' relationship, 517,170 My Pillow product boxes belonging to Telebrands were in the possession of MP. In addition, MP had ordered an additional 431,447 product boxes and 427,700 product labels from third-party manufacturer, Minnesota Corrugated, on Telebrands' behalf. In ordering these boxes

11

and labels, MP knew and understood that they would be owned by Telebrands, to be used only with products purchased by Telebrands.

50. Telebrands has learned that MP has wrongfully and without authorization used at least a portion of these boxes and labels to ship product to retailers without paying Telebrands (the boxes and labels used by MP hereinafter the "Property"). For the avoidance of doubt, Telebrands' conversion claim is made only with respect to the boxes and labels that are no longer in MP's possession.

51. Telebrands has an absolute and unconditional right to immediate possession of the Property because the boxes were ordered from Minnesota Corrugated on Telebrands' behalf and therefore Telebrands owns the boxes. In placing orders for the Property and accepting delivery of the Property, MP understood that the Property was owned by Telebrands and MP had no right to use the Property for any purpose other packaging and shipping product purchased by Telebrands.

52. In using the Property to ship My Pillow products, MP has wrongfully assumed control, dominion, and ownership over the Property. In using the Product to ship products other than those products purchased by Telebrands, MP has deprived Telebrands of its right to control and use the Property as Telebrands sees fit. In using the Product to ship products to customers other than Telebrands, MP wrongfully assumed ownership of the Property and used the Property entirely for MP's benefit, depriving Telebrands of all rights of ownership. Indeed, MP's actions have prevented Telebrands from enjoying any of the benefits of property ownership, including the rights to use, possess, accumulate, hold, rent, or sell the Property. Because boxes and labels, by their nature, cannot be re-used, MP's deprivation of Telebrands rights is permanent.

53. These acts constitutes conversion for which MP is liable.

54. MP's conversion of Telebrands' property was done with fraud, malice, willfulness, or with such gross negligence as to indicate a wanton disregard of the rights of Telebrands.

**REQUEST FOR RELIEF**

WHEREFORE, Telebrands respectfully requests the following relief:

A. The entry of judgment that the License Agreement is valid and in effect and that MP has breached the License Agreement or, in the alternative, the entry of judgment that MP is equitably estopped from denying its representations to Telebrands;

B. The entry of permanent injunction against MP, its officers, agents, servants, employees, attorneys, and all those persons in active concert or participation with any of them, from the wrongful acts and conduct set forth above, including, but not limited to:

    a. selling the My Pillow product directly to Telebrands' retail customers and

    b. requiring MP to comply with its obligation under the License Agreement;

C. An award of damages and restitution to Telebrands adequate to compensate for MP's wrongful conduct in an amount to be proven at trial, together with prejudgment and post-judgment interest on the damages awarded;

D. With respect to Telebrands' conversion claim, a constructive trust on any money acquired by means of MP's conversion, including all gross receipts attributable to MP's conversion of the Property and punitive damages for MP's wrongful conversion of Telebrands' Property;

E. An award to Telebrands of such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

13

Telebrands demands a trial by jury as to all claims and all issues properly triable thereby.

Date: February 20, 2020  TELEBRANDS CORP.

By: /s/ Robert D. Leighton

Kenneth S. Ulrich
Robert D. Leighton
GOLDBERG KOHN, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
312-201-4000
Kenneth.Ulrich@goldbergkohn.com
Robert.Leighton@goldbergkohn.com

Of Counsel:
Robert T. Maldonado (to be admitted pro hac vice)
Tonia A. Sayour (to be admitted pro hac vice)
COOPER & DUNHAM LLP
30 Rockefeller Plaza, Floor 20
New York, NY 10112
Tel.: (212) 278-0509
Rmaldonado@cooperdunham.com
Tsayour@cooperdunham.com