UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TELEBRANDS CORP., ) | |
| ) | |
| Plaintiff, ) | Case No. 18-CV-06318 |
| ) | |
| v. ) | Judge Sharon Johnson Coleman |
| ) | |
| MY PILLOW, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Telebrands Corporation ("Telebrands") filed a second amended complaint against defendant My Pillow, Inc. ("My Pillow") alleging breach of contract, equitable estoppel, and conversion. Defendant filed an amended counterclaim alleging fraud. Plaintiff moves to strike and exclude the testimony of defendant's expert witness. For the reasons set forth below, plaintiff's motion to strike [102] is denied and motion to exclude [99] is granted in part and denied in part.

**I. Background**

In May 2012, defendant and plaintiff entered into a license agreement ("Agreement") for plaintiff's pillow products. The Agreement gave defendant the right to market the products directly to consumers, while plaintiff had the exclusive right to market and distribute the products in North American brick and mortar retail stores and their associated online outlets. The Agreement stated:

> The term of the Agreement shall be for a period of one year and shall be automatically renewed for successive one year terms provided unit orders or sales of Current Product shall have reached at least 1,000,000 during the immediate prior year of the term of this Agreement. All units ordered or sold by Telebrands in excess of 1,000,000 in any given year shall be attributed to the next succeeding term. If, during any renewal term of this Agreement, Telebrands elects not to sell Current Product to a specific retailer, then upon My Pillow's written request, Telebrands shall consent to My Pillow selling Current Product to such specific retailer.

1

Dkt. No. 1, Compl. Ex. 1, at 5. The Agreement also stated that it would automatically terminate if plaintiff failed to order at least 200,000 units before November 30, 2012 (i.e., the first six months of the contract). *Id.* at 3. The Agreement further provided that the parties would attempt to negotiate a more extensive agreement within 60 days, and if they did not enter a more extensive contract, the Agreement would remain binding and in full force and effect. The parties were unable to complete a more extensive agreement after numerous extensions of the 60-day deadline.

Plaintiff purchased fewer than 1,000,000 units in the May 2013 contract year and in the following year (May 2013 to May 2014). On May 20, 2014, defendant's CEO Mike Lindell emailed plaintiff's representative Bala Iyer:

> I am following up on the agreement. As you know, the current License Agreement will end on May 30 because sales did not hit the 1,000,000 mark. I would like to set up a time to meet with you Mark Jim and Wayne to put together a new agreement. We should try to get the new agreement in place before the current one ends at the end of this month. Please give me a call. Mike.

Dkt. No. 1, Compl. Ex. 2, at 1.

Iyer does not recall discussing this email with Lindell or others at Telebrands. The parties did not ultimately enter into a new agreement, but plaintiff continued to sell the product. Because of the continued sale of the product, communications between the parties, and the course of dealing after May 2014, Iyer thought the Agreement was still in place despite continually missing the 1,000,000 unit requirement. Iyer did not send any written confirmation or expression of his belief that the Agreement was still in place, believing such a writing to be unnecessary. Iyer also did not discuss with anyone at Telebrands whether the Agreement was going to end at the end of May 2014. After May 2014, Iyer and My Pillow did not discuss the 1,000,000 unit renewal clause. Plaintiff continued to sell the product for four years.

Lindell testified that he thought the Agreement ended in 2014 and that the parties then entered individualized purchase orders for each buy. Plaintiff argues that Lindell may currently

2

believe the Agreement ended in 2014, but may not have believed that in 2014. Lindell also testified that he did not think in 2014 that the Agreement automatically cancelled, but that he gave notice that defendant would not renew through the May 20, 2014 email. Defendant's Director of Accounting and later Vice President of Finance, Kim Rasmussen, sent multiple emails to plaintiff appearing to rely on the Agreement after 2014. For example, Rasmussen emailed Telebrands' employees to "wire the money today per our agreement" (October 2014), "wire the 20% down payment…[t]he agreement is that we receive a 20% deposit with each Purchase Order" (December 2014), "wire[] every Thursday and Friday or we will require them within 24 hours as our agreement states" (August 2016), "[o]ur Agreement is that Telebrands will pay their invoice within 24 hours" (May 2017), and "[w]e agreed to Tuesdays and Thursdays rather than 'within 24 hours of leaving our dock' which is our terms" (August 2018). Dkt. 125, Def.'s Resp. to Pl.'s Statement of Additional Facts, at 5-11.

During meetings of defendant's board of directors, various executives referred to the Agreement ending in 2014. For example, the board mentioned on April 29, 2014 that the Agreement "expires on May 30th because Bala will not hit agreement of 1,000,000 units." Defendant's Response to Plaintiff's Statement of Additional Facts, Ex. 4. During a board meeting in 2018, the board mentioned that "Mike had a God dream that told him to get rid of Telebrands" and "[f]ound that contract expired in 2014." Dkt. 125, Def.'s Resp. to Pl.'s Statement of Additional Facts, at 21.

After May 2014, defendant, with plaintiff's knowledge, began selling directly to certain retailers, truck stops, hardware stores, travel stores, and airports. Plaintiff also reached 1 million units during the May 2015 to May 2016 year. Then, plaintiff's negotiations with retail clients resulted in the product's sales at Walmart, Kohl's, Bed Bath & Beyond, and JC Penney. At some point in 2016, the parties changed their shipping methods to a dropship structure. With the new method,

defendant would dropship items to retailers and plaintiff would pay defendant for the dropshipping costs rather than defendant shipping items to plaintiff and plaintiff shipping to the retailers. Plaintiff did, in fact, pay for the dropshipping materials (boxes and labels).

Over the years that plaintiff sold defendant's products, plaintiff's retailers purchased My Pillow "ad words," which would cause those retailers' advertisements to show up earlier in search engines when "My Pillow" or similar words were searched, instead of My Pillow's own website. Defendant contends that while plaintiff was selling its products, plaintiff agreed to monitor and ask its retail clients to refrain from false advertising of the product and purchasing My Pillow ad words on search engines. Plaintiff argues that it did not agree to do so, but only responded to specific instances of ad words concerns by defendant as a good business partner. Defendant expressed to plaintiff in March 2013 that they believed they were losing money because of ad words. In March 2016, Lindell told Iyer that defendant would not sell to plaintiff if the ad word issue was not addressed. Iyer responded to other Telebrands employees regarding this email and noted that he had told Lindell that plaintiff would not buy its own ad words relating to defendant. Telebrands drafted a written agreement requiring retail clients to stop purchasing ad words and threatening to stop selling if a retailer did not comply, but Iyer could not recall which retailers this agreement was sent to and whether any retailers signed it.

On August 21, 2018, defendant told plaintiff that it was discontinuing their relationship and would not accept any new purchase orders. Plaintiff disputed the termination. In response, defendant claimed that the Agreement did not require a notice of termination and that the Agreement automatically terminated once plaintiff did not order 1,000,000 units. Defendant sent another letter on August 28, 2018, referencing the ad words issue and again stating that it would not accept new purchase orders.

At the time the parties' business relationship terminated in August 2018, defendant had certain labels and boxes containing its artwork and logo that it had received from a third-party vendor, Minnesota Corrugated. Plaintiff claims that it owned these materials, which it had paid for, and the materials could only be used to dropship product purchased by plaintiff. Plaintiff and defendant negotiated a draft agreement for the purchase of the subject boxes and labels, but the agreement was never signed. After defendant terminated the relationship, plaintiff demanded payment for the boxes but did not demand the return of boxes that defendant had already used. Lindell asked a My Pillow employee, Robert Sohns, to put together an inventory of plaintiff's boxes and labels to send to plaintiff. Sohns sent this list, titled "Telebrands Inventory," to Iyer on October 4, 2018.

After the business relationship between plaintiff and defendant ended, plaintiff sued defendant. After this Court dismissed some claims, plaintiff brought an amended complaint for breach of contract, equitable estoppel, and conversion. Defendant countersued for fraud. Defendant denies wrongdoing and moves for summary judgment on plaintiff's amended complaint.

## II.   Plaintiff's Motion to Strike

Initially, the Court addresses plaintiff's motion to strike. John Bone was retained by defendant as a damages expert on September 3, 2020 (eleven days prior to the fact discovery deadline). After consulting with Bone, defendant determined that the most accurate way to perform an internet ad words damages calculation was to examine defendant's "cost per click" ("CPC") or the Google ad words that it purchases, as well as its conversion rate for those ad words. Bone testified that plaintiff's actions resulted in a higher CPC (ad words are more expensive to purchase) and a lower conversion rate (the percentage of people that click on defendant's advertising and end up buying directly from defendant's website). To perform the damages calculation, Bone relied on two spreadsheets containing data which defendant gathered from various sources and documents

upon Bone's request. Plaintiff seeks to preclude the use of these spreadsheets and strike Bone's testimony relying upon these spreadsheets, arguing that the spreadsheets were not timely produced during the fact discovery period and were withheld until defendant served Bone's expert disclosures. Defendant contends that the spreadsheets did not exist until Bone requested that the information therein be compiled for the purposes of his damages analysis and that the data contained in the spreadsheets is not kept in the ordinary course of defendant's business.

  a. *Legal Standard*

Under Federal Rule of Civil Procedure 26(a), a party must disclose "all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). However, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). When considering whether a document was prepared in anticipation of litigation, a court must determine if "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118–19 (7th Cir. 1983) (quoting 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2024) (emphasis in original). A district court has broad discretion to determine whether a Rule 26(a) violation is justified or harmless. *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996) (citation omitted).

  b. *Analysis*

Plaintiff argues that the spreadsheets contain data which defendant uses to support its fraud claim and thus, pursuant to Rule 26(a) and plaintiff's discovery request, this data should have been

6

produced prior to the close of fact discovery. Plaintiff also argues that the Northern District of Illinois Mandatory Initial Discovery Pilot ("MIDP") Standing Order requires that the data be produced during discovery. This Court, however, discontinued its participation in the MIDP as of December 2, 2019. As the present discovery dispute arose after that point, the MIDP is not applicable.

Defendant contends that the spreadsheets were created, and the underlying data was collected, per Bone's request and specifically for assisting in damages calculations. Defendant asserts that the information collected, namely data related to its "cost per click," "conversion rate" metrics, and cost of goods sold on a unit-by-unit basis, is not information which is kept in the ordinary course of business. Rather, defendant requested this information from third-party sources specifically for the purpose of litigation. Defendant contends that because Bone was a consulting expert, his work was subject to work product protection up until the point that he was disclosed as a testifying expert. Work product protection is extended to "material prepared by agents for the attorney as well as those prepared by the attorney himself." *Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 155 (N.D. Ill. 2020) (Cole, J.) (quoting *U.S. v. Nobles*, 422 U.S. 225, 238 (1975)).

Documents prepared in anticipation of litigation are protected by the work product doctrine given that they are "prepared or obtained because of the prospect of litigation." *Binks Mfg.*, 709 F.2d at 1119. Documents generated in the ordinary course of a party's business operations, however, are not protected by the work product doctrine. *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 135–36 (N.D. Ill. 1993) (Bobrick, J.).

Defendant retrieved the ad words data from third-party sources at Bone's request for the purposes of the claim against plaintiff. The spreadsheets did not contain data that was maintained nor accessed in the ordinary course of defendant's business operations. Therefore, the spreadsheets

7

and underlying data were subject to work product protection by virtue of Bone's role as a consulting expert. Once Bone was disclosed as a testifying expert, defendant promptly produced the spreadsheets and Bone's expert disclosures. Since Bone prepared the spreadsheets for the purposes of the litigation against Telebrands, the spreadsheets and their underlying data was subject to work product protection at the time of discovery and defendant did not violate Rule 26(a). There is no discovery violation, so the Court does not award Rule 37 sanctions.

### III. Plaintiff's Motion to Exclude

Plaintiff also moves to exclude Bone's entire testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 and Daubert require district judges to act as gatekeepers to ensure that proposed expert testimony is both reliable and relevant. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021). When determining reliability, the Court's role is to assess if the expert is qualified in the relevant field and to examine the methodology he used in reaching his conclusions. *Timm v. Goodyear Dunlop Tires North Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). To be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The expert's proponent has the burden of establishing the admissibility of his opinions by a preponderance of the evidence. *Varlen Corp. v. Liberty Mutual Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

Bone is a Managing Director of Stout Risius Ross, LLC, which is a financial advisory services firm. He received a Bachelor's in Business Administration from University of Michigan and an MBA from the University Chicago Booth School of Business. He is a CPA and is also certified in financial forensics (CFF).

Plaintiff challenges Bone's qualifications and methodology. Pursuant to Rule 702 and *Daubert*, courts ask whether an expert is qualified to answer specific questions, not just whether an

8

expert is generally qualified. *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019). This expertise comes not just from formal education, but can be based on knowledge, skill, training, or education. *United States v. Brown*, 973 F.3d 667, 703 (7th Cir. 2020). Plaintiff claims that Bone, as a damages expert, is unqualified to opine on whether plaintiff's actions caused defendant's CPC or conversion rate to change.

To the extent Bone purports to show causation between plaintiff's actions and defendant's CPC and conversion rate changes, that is impermissible as it is a legal conclusion. *See Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Causation is a key element of the fraud My Pillow claims Telebrands committed. Much of Bone's report is devoted to the causation issue and, as plaintiff points out, makes it seem as if Bone is being offered as both a subject matter and damages expert rather than simply a damages expert. Further, plaintiff notes that Bone fails to consider other external factors that could have caused a lower conversion rate, such as Lindell's publicity. The Court thinks it extremely possible and, in fact, likely that Lindell's striking notoriety may have impacted whether consumers ultimately chose to buy his products. Bone's failure to discuss such key factors make it even more obvious to the Court that he is only qualified as a damages expert and cannot opine on causation. But as an established financial expert, Bone can provide his opinion on damages assuming defendant establishes liability. *See Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012).

IV. **Conclusion**

Plaintiff's motion to strike is denied and motion to exclude is granted in part and denied in part. **IT IS SO ORDERED**.

Date: September 9, 2021         Entered: _____
                                SHARON JOHNSON COLEMAN
                                United States District Court Judge

9